Case No. 20-1870

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**Marvin Gerber and Dr. Miriam Brysk,**

*Plaintiffs-Appellants*

v.

**Henry Herskovitz, Gloria Harb, Tom Saffold, Rudy List, Chris Mark,
Deir Yassin Remembered, Inc., Jewish Witnesses for Peace and Friends,
The City of Ann Arbor, Ann Arbor Mayor Christopher Taylor,
in his official and individual capacities,
Ann Arbor Community Services Administrator Derek Delacourt,
in his official and individual capacities, Ann Arbor City Attorney
Stephen Postema, in his official and individual capacities,
and Senior Assistant City Attorney Kristen Larcom,
in her official and individual capacities, jointly and severally,**

*Defendants-Appellees*

---

**On appeal from the United States District Court
For the Eastern District of Michigan
Honorable Victoria Roberts, Case No. 2:19-cv-13726**

---

**MARC SUSSELMAN'S MOTION FOR A 14-DAY EXTENSION
OF TIME FOR MARVIN GERBER TO FILE A PETITION FOR
REHEARING AND FOR REHEARING EN BANC AND FOR AN ORDER
OF WITHDRAWAL AS ATTORNEY FOR MARVIN GERBER ONLY**

Marc M. Susselman (P29481)
Attorney for Appellant Miriam Brysk
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com

Marc M. Susselman hereby moves pursuant to Federal Rule of Appellate Procedure 26(b) and Rule 26 of this Court's Rules for an additional 14-day extension of time within which Marvin Gerber may file a petition for rehearing and for rehearing *en banc* from October 13, 2021 to October 27, 2021, to rehear the decision of the panel rendered on September 15, 2021 attached hereto as Exhibit 1, and for a Formal Order allowing Marc M. Susselman to withdraw as attorney for Marvin Gerber.

Marc Susselman recognizes that under this Court's Rule 40 such an application is granted only "for the most compelling reasons." The following are "compelling reasons" to extend the time for Marvin filing the petition for rehearing *en banc* and for allowing Marc M. Susselman to withdraw as attorney for Marvin Gerber only.

1.      The panel decision was rendered on September 15, 2021.  In the decision, the Court reversed the District Court's ruling that the plaintiffs did not have standing to sue.  The Court proceeded to hold that the plaintiffs had failed to state a claim and dismissed the lawsuit.

2.      The undersigned proceeded to prepare a petition for *en banc* rehearing. Under the terms of a co-counsel agreement which the undersigned has with the employer of his co-counsel, Ziporah Reich, the undersigned is designated as the lead

1

attorney and has final say as to all decision related to the lawsuit, and final approval as to all motions and briefs to be filed in the lawsuit.

3.      At the urging of another attorney who had been in communication with one of the plaintiffs, Marvin Gerber, the undersigned filed a motion for a 14-day extension of the due date for the petition.  The Court granted the motion, extending the due date from September 29 to October 13, 2021.

4.      On October 1, 2021, at 12:38 A.M., the undersigned received an email from Mr. Gerber stating that he and his co-plaintiff, Dr. Miriam Brysk, had decided to terminate the undersigned.  The email did not accuse the undersigned of having violated the standard of practice in the lawsuit, or of having violated the Michigan Rules of Professional Conduct.  The basis of the termination was essentially dissatisfaction with the outcome of the appeal.

5.      Later that day, the undersigned attempted to reach the co-plaintiff, Dr. Miriam Brysk, by telephone, but no one answered the phone and no one returned the undersigned's telephone calls.

6.      At approximately 9:30 A.M. on October 1, the undersigned drove to Dr. Brysk's home in Ann Arbor, Michigan.  He was admitted to the home by Dr. Brysk's husband, Henry Brysk.  Dr. Brysk, who is 86 years of age and a Holocaust survivor, was lying on a couch watching TV.  She indicated that she was suffering

from severe back pain.  The undersigned asked Dr. Brysk if she had spoken to Mr. Gerber.  She stated that she had not.  The undersigned asked her if she had authorized Mr. Gerber to terminate the undersigned as her attorney.  She indicated that she had not.  The undersigned asked her if she wanted him to continue to represent her in the lawsuit.   Dr. Brysk indicated that she wanted the undersigned to continue to represent  her in the lawsuit, stating that she liked him.

7.    The undersigned asked Mr. Brysk if he had spoken to Mr. Gerber.  Mr. Brysk indicated that Mr. Gerber had called the day before and had spoken only to Mr. Brysk; he had not spoken to his co-plaintiff Dr. Brysk.  Mr. Gerber informed Mr. Brysk that he intended to fire the undersigned as his attorney.  Mr. Brysk told Mr. Gerber that he did not think it was a good idea to change horses midstream.  The undersigned asked Mr. Brsyk if he told Mr. Gerber that Dr. Brysk wanted to fire me.  Mr. Brysk indicated that he never told Mr. Gerber that Dr. Brysk wanted to fire the undersigned.

8.    The undersigned had brought with him a printed statement to be signed by Dr. Brysk indicating that she had not terminated him and wanted him to continue to represent her.  Dr. Brysk indicated that she did not want to sign any legal papers, that she was in declining health and wanted only to concentrate on her health.  The undersigned accepted this explanation.  As he was leaving, he asked Dr. Brysk not to sign anything which Mr. Gerber would ask her to sign.  Dr. Brysk stated that she

would not sign anything that Mr. Gerber, or anyone else, presented to her to sign. Mr. Brysk indicated that he would resist Dr. Brysk signing anything.

9.    When the undersigned returned to his office, he sent Mr. Gerber an email indicating that he had met with Dr. Brysk and that she denied that he had given him permission to terminate me on her behalf and that she wanted the undersigned to continue to represent her.  The undersigned stated that Mr. Gerber's representation that he and Dr. Brysk wanted to terminate the undersigned was false.  He further indicated that since there were only two plaintiffs, both of whom were his clients, Mr. Gerber could not unilaterally terminate him from the lawsuit.  He further stated that in the future, he would not accept any representation from Mr. Gerber that Dr. Brsyk wanted to fire him.  If Dr. Brysk wanted to terminate him, she would have to state this in writing and sign the statement.  He stated further that he was therefore still the attorney of record and would be filing a petition for *en banc* rehearing.

10.    At 12:47 P.M. on October 1, Mr. Gerber sent an email to the undersigned, stating:

> I just spoke to Miriam – She doesn't want you to be her lawyer. you are Fired!!!!!

11.    The undersigned immediately  sent Mr. Gerber a response, stating:

> I do not accept your representation.  I want to see it in writing, signed by Miriam Brysk.

12.    At 1:35 P.M. on October 1, 2021, Florence Gerber, Marvin Gerber's

wife, sent the undersigned a photo-shot of the following statement, with what appeared to be Miriam Brysk's signature:

> to Marc Susselman
> You are fired as my attorney immediately.
> Miriam Brysk

13.     Later that day, at 8:09 P.M., October 1, 2021, the undersigned received an email from Henry Brysk, which stated (see copy of email attached as Exhibit 2):

> The Gerbers came over this afternoon and stampeded Miriam into reversing herself; she was quite clueless and ignored me. I disagreed, but I had no control over the situation.
>
> This has been a long and repeatedly disheartening process. Much more massively for you, of course. I am increasingly convinced that fighting for the ungrateful is Quixotic.

15.     On October 8, 2021, the undersigned went to the home of Miriam Brysk.  In the presence of her husband, he asked her if she had signed the statement which the Gerbers had emailed to him stating that Miriam Brysk was terminating Marc Susselman as her attorney.  Miriam Brysk stated that she could not recall signing such a statement.  When the undersigned asked her if she wanted to fire him as her attorney, Miriam Brysk stated, "I don't want to fire anyone."

16.     The undersigned then asked Mr. Brysk if the email he had sent him on October 1, 2021, accurately reflected what had occurred when Mr. and Mrs. Gerber had come to their home that afternoon.  He indicated that it did.  The undersigned

then gave a Declaration to Mr. Brysk to review.  After reviewing the Declaration,

Mr. Brysk indicated he would sign it, and did so.  The Declaration states, in relevant

part (copy of Declaration attached as Exhibit 3):

> ¶5.    Mr. and Mrs. Gerber bullied Dr. Brysk into signing the statement which they had prepared indicating that she was immediately terminating Mr. Susselman as her attorney against her will.
>
> I declare under penalty of perjury that the foregoing is true and correct.
>
> Executed on this 8th day October, 2021.

17.    I have a separate engagement contract with Miriam Brysk as her

attorney.  Mr. Gerber and Mrs. Gerber have tortiously interfered with my attorney-

client relationship with Miriam Brysk.  Moreover, based on Mr. Brysk's email and

his Declaration, they coerced Miriam Brsyk to sign a statement terminating me

against her will.  The statement of termination is therefore invalid and unenforceable

under Michigan law.  The undersigned accordingly remains as Miriam Brysk's

attorney of record.

18.    To date, the undersigned has not received any communication from any

attorney with a proposal to substitute in for me on the appeal.

19.    Since no attorney has contacted me to substitute in as an attorney for

Marvin Gerber, I am requesting that another 14-day extension be granted to Mr.

Gerber in order to allow whomever he retains to file a petition for *en banc* rehearing on his behalf.

20.    Since I have been terminated by Mr. Gerber, I am requesting that a Formal Order be issued allowing me to withdraw as Mr. Gerber's attorney.

21.    Since I continue to be the attorney of record representing Miriam Brysk, and have a professional obligation to protect her legal interests, I am on this date filing a petition for *en banc* rehearing on behalf of Dr. Miriam Brysk only.

**WHEREFORE,** the undersigned requests that the due date for Marvin Gerber's petition for rehearing *en banc* be extended an additional 14 days, until October 27, 2021, to allow any attorney whom Mr. Gerber may retain to have sufficient time  to file such a petition on his behalf.  The undersigned further requests the issuance of a Formal Order allowing the undersigned to withdraw as attorney for Marvin Gerber.

Respectfully submitted,

Marc M. Susselman (P29481)
Attorney for Appellant Miriam Brysk
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com

/s/  Marc M. Susselman

Dated:  October 8, 2021.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that he served a copy of the Motion For 14-Day Extension Of Time For Marvin Gerber To File Petition For Rehearing And For Rehearing *En Banc,* and for Withdrawal of Marc Susselman as attorney for Marvin Gerber, on October 8, 2021.

<div style="margin-left:40%">

Marc M. Susselman (P29481)
Attorney at Law
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com

By:    /s/  Marc M. Susselman
   Attorney at Law

</div>

Dated: October 8, 2021

**EXHIBIT 1**

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0219p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

─────────────────

MARVIN GERBER; MIRIAM BRYSK,

*Plaintiffs-Appellants,*

*v.*

HENRY HERSKOVITZ; GLORIA HARB; TOM SAFFOLD; RUBY LIST; CHRIS MARK; DEIR YASSIN REMEMBERED, INC.; JEWISH WITNESSES FOR PEACE AND FRIENDS; CITY OF ANN ARBOR, MICHIGAN; CHRISTOPHER M. TAYLOR, DEREK DELACOURT, STEPHEN K. POSTEMA, and KRISTEN D. LARCOM, in their official and individual capacities,

*Defendants-Appellees.*

No. 20-1870

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:19-cv-13726—Victoria A. Roberts, District Judge.

Argued: April 27, 2021

Decided and Filed: September 15, 2021

Before: SUTTON, Chief Judge; CLAY and McKEAGUE, Circuit Judges.

─────────────────

### COUNSEL

**ARGUED:** Marc M. Susselman, Canton, Michigan, for Appellants. John A. Shea, Ann Arbor, Michigan, for Appellees Henry Herskovitz, Jewish Witnesses for Peace and Friends, Ruby List, Chris Mark, and Tom Saffold. Timothy S. Wilhelm, CITY OF ANN ARBOR, Ann Arbor, Michigan, for City of Ann Arbor Appellees. **ON BRIEF:** Marc M. Susselman, Canton, Michigan, Ziporah Reich, THE LAWFARE PROJECT, New York, New York, for Appellants. John A. Shea, Ann Arbor, Michigan, Cynthia Heenan, CONSTITUTIONAL LITIGATION ASSOC., P.C., Detroit, Michigan, for Appellees Henry Herskovitz, Jewish Witnesses for Peace and Friends, Ruby List, Chris Mark, and Tom Saffold. Timothy S. Wilhelm, CITY OF ANN ARBOR, Ann Arbor, Michigan, for City of Ann Arbor Appellees. Daniel S. Korobkin, AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN, Detroit, Michigan, for Amici Curiae.

SUTTON, C.J., delivered the opinion of the court in which McKEAGUE, J., joined, and CLAY, J., joined in the result. CLAY, J. (pp. 14–30), delivered a separate concurring opinion.

———————————

## OPINION

———————————

SUTTON, Chief Judge.  Anti-Israel protesters have picketed services at the Beth Israel Synagogue in Ann Arbor, Michigan, every week going back to 2003, over 935 weeks in total. Understandably frustrated with this pattern, members of the congregation sued the protesters and the city.  The district court granted the defendants' motions to dismiss for lack of standing.  We disagree on that point, as the plaintiffs have alleged a concrete and particularized harm to a legally protected interest.  But the reality that they have standing to bring these claims does not entitle them to relief.  The key obstacle is the robust protections that the First Amendment affords to nonviolent protests on matters of public concern.  We affirm the district court's dismissal on that basis.

I.

Every Saturday morning since September 2003, protesters have picketed the Beth Israel Synagogue.  Their group typically comprises six to twelve people, and they display signs on the grassy sections by the sidewalk in front of the synagogue and across the street from it.  The signs carry inflammatory messages, with statements such as "Resist Jewish Power," "Jewish Power Corrupts," "Stop Funding Israel," "End the Palestinian Holocaust," and "No More Holocaust Movies."  R.11 at 2–3.  The protests apparently target the members of the Beth Israel Congregation, as they coincide with the arrival of the congregants to their worship service on Saturday morning.  The congregants and their children can see the signs as they enter their worship service.  But the protesters have never prevented them from entering their house of worship, have never trespassed on synagogue property, and have never disrupted their services.

The signs, the congregants allege, inflict extreme emotional distress on members of the synagogue.  Marvin Gerber, for example, sometimes forgoes attending services or visits a different synagogue to avoid the signs.  Dr. Miriam Brysk, a Holocaust survivor, feels extreme emotional distress when she sees the signs.

The protesters have not applied for or obtained a permit to engage in these activities. City employees have insisted that they cannot curtail the protesters' conduct because the First Amendment protects it. Ann Arbor police at times have been present at the protests and in those instances have not interfered with the protesters' activities. Counsel for Gerber and Dr. Brysk contacted city employees and claimed that the protests violated provisions of the municipal code regarding the placement of objects in public thoroughfares. But these communications did not go anywhere.

Fed up, Gerber and Dr. Brysk, referred to as the congregants from now on, filed a lawsuit in federal court against the protesters, the city of Ann Arbor, and various city officials. They brought thirteen federal claims and several state claims. As for the federal claims, the congregants alleged that the protests (and the city's failure to enforce a city sign ordinance against the protesters) violated various federal laws as well as the congregants' substantive due process and free exercise rights. The congregants also claimed that the city violated their First Amendment right to petition the government when it instructed the congregants' lawyer not to discuss the sign ordinance with city officials other than the city attorney. The congregants asked for damages and an injunction prohibiting the protests or, in the alternative, one imposing time, place, and manner restrictions on the protests so that they did not take place near the synagogue during services, among other forms of relief.

The protesters and city moved to dismiss the complaint for lack of jurisdiction under Civil Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6). The district court granted the 12(b)(1) motion, holding that the congregants lacked standing because their claims of emotional distress did not establish a concrete injury. The district court separately declined to exercise supplemental jurisdiction over the state claims and dismissed them without prejudice. The congregants appealed.

II.

We first take up the district court's standing ruling. The U.S. Constitution empowers the federal courts to decide "Controversies" and "all Cases, in Law and Equity, arising under this Constitution [and] the Laws of the United States." U.S. Const. art. III, § 2. Consistent with the

case-and-controversy requirement, several justiciability doctrines limit the judicial power, the most prominent being standing. To have standing, a plaintiff must allege (1) an injury in fact (2) that's traceable to the defendant's conduct and (3) that the courts can redress. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–61 (1992). The standing inquiry is not a merits inquiry. A merits defect deprives a court of subject matter jurisdiction only if the claim is utterly frivolous. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998).

The congregants readily satisfy the second and third prongs of the standing inquiry. As to traceability, a defendant's actions must have a "causal connection" to the plaintiff's injury. *Lujan*, 504 U.S. at 560. The congregants have alleged that the protesters' conduct and their conspiracy with city employees not to enforce the city's ordinances foreseeably caused members of the congregation extreme emotional distress. That creates the requisite causal link. As to redressability, it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (quotation omitted). If the district court awarded damages or enjoined the Saturday morning protests, that relief would redress the congregants' alleged injuries.

The key question is whether the congregants' allegation—that the protesters caused them extreme emotional distress—establishes a cognizable injury in fact. To satisfy this imperative, the claimant must establish the "'invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560). To qualify as particularized, an injury "must affect the plaintiff in a personal and individual way," *Lujan*, 504 U.S. at 560 n.1, not in a general manner that affects the entire citizenry, *Lance v. Coffman*, 549 U.S. 437, 439 (2007). The parties all agree that this injury is particularized. So do we. The protesters directed their picketing at the synagogue goers based on the time and location of their demonstrations, and the picketing indeed affected them in a "personal and individual way." *Lujan*, 504 U.S. at 560 n.1.

But is this particularized injury concrete? A "concrete" injury is one that "actually exist[s]." *Spokeo*, 136 S. Ct. at 1548. In the case of an intangible injury like this one, the claimant must establish "a close relationship to a harm that has traditionally been regarded as

providing a basis for a lawsuit in English or American courts." *Id.* at 1549; *see TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021). Emotional distress fits that bill. "Distress," including "mental suffering or emotional anguish," forms "a personal injury familiar to the law." *Carey v. Piphus*, 435 U.S. 247, 263, 264 n.20 (1978). It carries a "close relationship" to a traditional harm. *Spokeo*, 136 S. Ct. at 1549. And it has "been part of our common-law tradition for centuries." *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 873 (6th Cir. 2020) (Murphy, J., concurring in part) (citing Joseph Henry Beale, *Collection of Cases on the Measure of Damages* 337–63 (1895); Arthur G. Sedgwick, *Elements of Damages: A Handbook for the Use of Students and Practitioners* 98–105 (1896)).

Any other conclusion would deprive a federal court sitting in diversity of authority to hear any state law intentional infliction of emotional distress claim. That would be news to a lot of people, including many parties who have won and lost such claims on the merits in federal court over the years.

The congregants' allegations in the end come comfortably within the scope of this traditional harm. They have alleged that the protesters' relentless and targeted picketing of their services has caused them extreme emotional distress. Permitting the federal courts to handle injuries of this sort parallels causes of action permitted in other areas. In the Establishment Clause context, for example, "psychological injury" from "direct and unwelcome contact" with a poster of the Ten Commandments constitutes "injury in fact sufficient to confer standing." *Am. C.L. Union of Ohio Found. v. DeWeese*, 633 F.3d 424, 429 & n.1 (6th Cir. 2011) (quotation omitted); *see Washegesic v. Bloomingdale Pub. Schs.*, 33 F.3d 679, 682 (6th Cir. 1994). We have "consistently rejected" arguments that "psychological injury can never be the basis for Article III standing." *Am. C.L. Union*, 633 F.3d at 429 n.1.

All in all, the congregants have standing to sue because they have credibly pleaded an injury—extreme emotional distress—that has stamped a plaintiff's ticket into court for centuries.

The contrary arguments are unconvincing. "[A]llegations of a subjective 'chill,'" the district court ruled, "are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." R.66 at 9 (quotation omitted). As the district court saw it,

the alleged distress and interference with religious services constituted a "subjective chill" that failed to reach the level of concrete harm. But the congregants did not merely allege that the protesters "chilled" their First Amendment rights. They claimed that the protesters caused them extreme emotional distress on its own. The cases invoked by the district court involved only allegations that general state policies or surveillance chilled the plaintiffs' exercise of free speech. *See Morrison v. Bd. of Educ. of Boyd Cnty.*, 521 F.3d 602 (6th Cir. 2008); *Laird v. Tatum*, 408 U.S. 1 (1972); *Muslim Cmty. Ass'n of Ann Arbor v. Ashcroft*, 459 F. Supp. 2d 592 (E.D. Mich. 2006). None of these cases involved allegations of extreme emotional distress. And none addressed harms arising from action targeting the claimants.

The defendants next argue that the requirement that claimants establish the violation of "a legally protected right or interest" creates an independent fourth requirement to establish standing. City Appellee Br. at 15. Our legal system, they add, does not protect the plaintiffs from offensive speech under the U.S. Supreme Court's First Amendment jurisprudence and thus the claim must be dismissed for lack of standing. But this phrase requires only that the plaintiff show she "has a right to relief if the court accepts the plaintiff's interpretation of the constitutional or statutory laws on which the complaint relies." *CHKRS, LLC v. City of Dublin*, 984 F.3d 483, 488 (6th Cir. 2021). In *CHKRS*, the district court found the plaintiffs lacked standing because they failed to allege a legally protected interest. But we reversed the decision because the trial court relied on Fifth Amendment takings precedent rather than cases articulating the requirements for Article III standing, blurring the lines between standing and the merits. *Id.* at 489. "[J]ust because a plaintiff's claim might fail on the *merits*," we cautioned, "does not deprive the plaintiff of *standing* to assert it." *Id.*

Consistent with *CHKRS*, the Tenth Circuit, in interpreting "legally protected interest," explained that "the question cannot be whether the Constitution, properly interpreted, extends protection to the plaintiff's asserted right or interest. If that were the test, every losing claim would be dismissed for want of standing." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1092 (10th Cir. 2006) (en banc). The defendants' position not only would require a close analysis of the merits in order to determine the question of standing, but it also would bar constitutional challenges on jurisdictional grounds in many cases where the argument faces

adverse precedent—precedent that may one day be changed.  Rather, the phrase requires only that the plaintiff have a "right to relief if the court accepts" the plaintiff's legal position about the meaning of a constitutional provision or a statute.  *CHKRS*, 984 F.3d at 488; *see Steel Co.*, 523 U.S. at 89–90.

Defendants' invocation of *Snyder v. Phelps*, 562 U.S. 443 (2011), also fails to separate the standing and merits inquiries.  At issue was whether the father of a soldier recently killed in combat could bring a state law tort claim for emotional distress against individuals who protested near the son's funeral.  The Court held that the First Amendment served as a defense to the *merits* of the plaintiff's claim based on the picketing of his son's funeral.  It did not, however, deprive the plaintiff of *standing* to bring the claim.  To the contrary, *Snyder* suggests (even though it does not say so expressly) that emotional distress caused by offensive speech suffices to establish Article III standing.  How else did the Court have authority to resolve the merits of the claim?

A merits defect, it is true, may raise a jurisdictional problem when it renders a claim truly frivolous.  *Steel Co.*, 523 U.S. at 89; *CHKRS*, 984 F.3d at 489.  But that is not remotely this case, and not even the city argues otherwise.

We respect the concurrence's contrary position but ultimately find it unconvincing.  The raw, calculated-to-hurt nature of today's speech in some ways parallels the speech in *Snyder*.  Yet one cannot read *Snyder* and think the majority thought the state law tort action—premised on protests by members of the Westboro Baptist Church that disrespected the service and memory of a dead soldier and his grieving family—was frivolous under the First Amendment.  Or think that Justice Alito's dissent in support of the family's action was frivolous.  *See* Ruth Bader Ginsburg, Assoc. Just., U.S. Sup. Ct., A Survey of the 2010 Term for presentation to the Otsego County Bar Association Cooperstown Country Club (July 22, 2011) (praising Justice Alito's dissent and acknowledging that Justice Stevens would have joined it if he had been on the Court).

Even after *Snyder*, there is still work to be done in resolving fact-driven claims of this ilk.  One could colorably argue that signs that say "Jewish Power Corrupts" and "No More Holocaust

Movies" directly outside a synagogue attended by holocaust survivors and timed to coincide with their service are more directed at the private congregants than designed to speak out about matters of public concern. The claims require a context-driven examination of complex constitutional doctrine. That doctrine is not always intuitive, as shown by the reality that the captive audience doctrine applies to civil regulation of protests outside homes and abortion clinics but not court-ordered injunctions outside houses of worship. Plaintiffs' claims may be wrong and ultimately unsuccessful, but the fourteen pages that the concurrence devotes to analyzing the constitutional issues belie the conclusion that they are frivolous.

III.

On the merits, the congregants' federal claims fall into four buckets: substantive due process, religious liberty, general civil rights, and a constitutional right to petition the government.

A.

*Substantive due process*. The congregants claim that the city violated the Fourteenth Amendment by failing to enforce the municipal code or otherwise failing to shut down the protests. This inaction, they say, violates their substantive due process rights. Abuse of executive power, it is true, may violate substantive due process in those rare instances when it "shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). But the city's protection of the protesters' peaceful free-speech rights does not sink to the level of conscience-shocking state action. Substantive due process does not require what the First Amendment prohibits.

Sidewalks are traditional public fora, meaning they "occupy a special position in terms of First Amendment protection because of their historic role as sites for discussion and debate." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (quotation omitted). "[T]he guiding First Amendment principle that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content applies with full force in a traditional public forum." *Id.* at 477 (quotation omitted). Speech "at a public place on a matter of public concern . . . is entitled to 'special protection' under the First Amendment. Such speech cannot be

restricted simply because it is upsetting or arouses contempt." *Snyder*, 562 U.S. at 458. We evaluate whether speech covers a matter of public concern based on "the content, form, and context of that speech." *Id.* at 453 (quotation omitted). And we are vigilant in monitoring efforts to suppress unpopular speech. It is usually "the minority view, including expressive behavior that is deemed distasteful and highly offensive to the vast majority of people, that most often needs protection under the First Amendment." *Bible Believers v. Wayne County*, 805 F.3d 228, 243 (6th Cir. 2015) (en banc).

The protesters' actions come squarely within First Amendment protections of public discourse in public fora. As in *Snyder*, the content and form of the protests demonstrate that they concern public matters: American-Israeli relations. As in *Snyder*, the protest location is a quintessential public forum: public sidewalks. The context of being outside a house of worship at the time of a service cuts slightly towards being a private attack, but that factor alone was not heavy enough to tip the balance in *Snyder*, and it is likewise too feathery here. 562 U.S. at 454–55.

The congregants claim that the First Amendment does not apply to the unique features of this protest. Five considerations, they say, make this case novel: (1) the protests' proximity to a house of worship, (2) their location in a residential area, (3) the fact that the congregants are a captive audience, (4) the frequency of the protests, and (5) the exposure of congregants' children to the signs. But each of these factors is old hat under the First Amendment.

Take the first three. Courts have allowed speech restrictions based on concerns for a captive audience in a deliberately narrow context, and we see no justification for expanding it here. *Snyder* insisted on the concept's narrowness, applying it only to an individual's residence and declining to extend it to a church holding a funeral. *Snyder*, 562 U.S. at 459–60. Our sister circuits have likewise declined to allow restrictions on protesting near houses of worship, rejecting justifications like those the congregants offer. *See, e.g.*, *Survivors Network of Those Abused by Priests, Inc. v. Joyce*, 779 F.3d 785, 793 (8th Cir. 2015). Expressive activity in a residential area by itself does not suffice for an exception; an individual's home itself must be the focus of the protest. *Frisby v. Schultz*, 487 U.S. 474, 485–87 (1988) ("The type of focused picketing [of a home] prohibited by the Brookfield ordinance is fundamentally different from

more generally directed means of communication that may not be completely banned in residential areas.").

The congregants' fourth and fifth factors fall readily as well. The protesters' actions do not lose constitutional protection just because they have been protesting for a long period of time. Free-speech protections do not expire over time or come with a rule against perpetuities. And the Supreme Court has repeatedly held that an interest in protecting children does not justify censoring speech addressed to adults. *Reno v. Am. C.L. Union*, 521 U.S. 844, 875 (1997).

The congregants' proposed remedy—an injunction prohibiting protests within 1000 feet of the synagogue during Saturday morning services and limiting the number of protesters and signs—likely would violate the First Amendment anyway. State action "would not be content neutral," the Supreme Court has explained, "if it were concerned with undesirable effects that arise from the direct impact of speech on its audience or [l]isteners' reactions to speech." *McCullen*, 573 U.S. at 481 (alteration in original) (quotation omitted). Understandable though the congregants' reaction to the protesters' speech may be, that by itself—without physical impediments to their services or trespassing—cannot suffice as the kind of "content-neutral justification" needed to make the proposed injunction a reasonable time, place, and manner restriction. *Id.* The restriction, moreover, would disproportionately affect one viewpoint on an issue of public concern, which makes us pause before concluding it would be "justified without reference to the content of the regulated speech." *Id.* at 477 (quotation omitted).

Even if the request were eligible for treatment as a time, place, and manner restriction, the injunction would be overly broad. Neither the 1000-foot buffer zone nor the restriction to five protesters at *any* time is likely to satisfy narrow tailoring. *Madsen v. Women's Health Center* held that a 300-foot buffer zone was not narrowly tailored, 512 U.S. 753, 775 (1994), and our circuit has held that like-sized zones are overbroad, *Anderson v. Spear*, 356 F.3d 651, 657 (6th Cir. 2004).

B.

*Religious liberty statutes: RFRA and RLUIPA.* The congregants also seek relief under the Religious Freedom Restoration Act (RFRA) and the Religious Land Use and Institutionalized

Persons Act (RLUIPA).  42 U.S.C. § 2000bb – 2000cc-5.  But RFRA has no role to play.  It does not apply to state or local governments.  *City of Boerne v. Flores*, 521 U.S. 507 (1997).  And RLUIPA has no role to play either.  Under the Act, a claimant must have a "property interest in the regulated land."  42 U.S.C. § 2000cc-5(5).  A plaintiff under RLUIPA fails to state a claim when he does not have a legally recognized property interest in the property at issue.  *Taylor v. City of Gary*, 233 F. App'x 561, 562 (7th Cir. 2007).  The congregants have not alleged how their status as members of a religious community by itself gives them a property interest in this house of worship.

<p style="text-align:center">C.</p>

The congregants also bring a bevy of claims under several other federal civil rights statutes.

*42 U.S.C. § 1981*.  Section 1981 guarantees to persons of all races "the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  The congregants say that the protesters violated § 1981 by targeting them for persecution because of their race.  But they have failed to allege that they lost out on the benefit of any "law or proceeding."  *Chapman v. Higbee Co.*, 319 F.3d 825, 832 (6th Cir. 2003).

*42 U.S.C. § 1982*.  Section 1982 guarantees to all citizens the same rights "to inherit, purchase, lease, sell, hold, and convey real and personal property."  42 U.S.C. § 1982.  To violate the statute, the challenged action must impair a property interest, say by decreasing the value of the property or making it significantly more difficult to access.  *City of Memphis v. Greene*, 451 U.S. 100, 122–24 (1981).  But marginally making access to a facility a little harder—the most that could be said here—does not suffice.  While our circuit has held that the verb "hold" could encompass the "use" of the property by nonowner congregants, the impairment of use in that case differed in kind from those alleged here.  *United States v. Brown*, 49 F.3d 1162, 1164 (6th Cir. 1995).  The action in *Brown* involved white supremacists who shot into a synagogue with an assault pistol.  But the congregants have not alleged that the protesters ever blocked them from using their synagogue or that the protests were even audible from inside the building.

*42 U.S.C. § 1983*.  The congregants allege that the city and the protesters, acting under color of law, are liable for failing to enforce the sign code and for failing to protect their free exercise rights.  But § 1983 applies to harm inflicted by government officials, not to harm inflicted by third parties that the city fails to prevent.  *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989); *see Town of Castle Rock v. Gonzales*, 545 U.S. 748, 768 (2005).  The claims against the protesters fail because they do not satisfy any of the tests that would make them state actors:  They did not perform a public function, the city did not force them to protest, and a symbiotic relationship does not exist between the protesters and the city. *See Lansing v. City of Memphis*, 202 F.3d 821, 828–31 (6th Cir. 2000).

*42 U.S.C. § 1985(3)*.  The congregants allege that the protesters and city have conspired to interfere with their right to free exercise of religion and intra-state travel.  The conspiracy must involve state action, *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 832 (1983), which requires that the defendants acted under state authority or were themselves state actors, *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 938–39 (1982).  We have suggested that *inter*-state travel is a prerequisite before the statute applies.  *Volunteer Med. Clinic, Inc. v. Operation Rescue*, 948 F.2d 218, 226 (6th Cir. 1991).  But even if intra-state travel suffices, the congregants have not alleged sufficient state action.  The protesters did not act under color of state law, and the city was not otherwise responsible for their conduct.  *See id.* at 227.

*42 U.S.C. § 1986*.  The congregants claim that the city defendants failed to prevent the protesters' conspiratorial conduct.  Section 1986 provides a cause of action for additional damages against a party that fails to prevent a § 1985 violation.  42 U.S.C. § 1986.  Because their § 1985 claim fails, however, their § 1986 claim must meet a similar fate.

*Civil conspiracy under §§ 1982, 1983, and 1985(3)*.  The congregants also bring civil conspiracy claims under §§ 1982, 1983, and 1985(3) against the city as well as the protesters. Such claims allege "an agreement between two or more persons to injure another by unlawful action."  *Hooks v. Hooks*, 771 F.2d 935, 943–44 (6th Cir. 1985).  The claimant "must show that (1) a single plan existed, (2) [the defendant] shared in the general conspiratorial objective to deprive [the plaintiff] of his constitutional (or federal statutory) rights, and (3) an overt act was committed in furtherance of the conspiracy that caused injury to [the plaintiff]."  *Bazzi v. City of*

*Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011).  These claims fail because the congregants have failed to plead facts showing a single plan or a conspiratorial objective to deprive them of their rights.  They merely allege that city police witnessed some protests and that city lawyers knew of the demonstrations but did not stop them.  Nothing in the complaint indicates that the city agreed to inflict emotional distress on the congregants or injure them in any way.

<div align="center">D.</div>

*Right to petition*.  The congregants allege that the city defendants have an obligation to provide them with accurate information about how they apply the city's sign code based on the congregants' First Amendment right "to petition the Government for a redress of grievances."  U.S. Const. amend. I.  But the freedom to petition protects the public's right to address the government, nothing more.  The government may refuse to listen or respond to the petitioner.  *Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 285 (1984).  The right to petition simply does not include a right to a response from the government.  The congregants' invocation of cases about the right to access the courts does not help because they have not shown that their lack of access to this information "hindered [their] efforts to pursue a legal claim."  *Lewis v. Casey*, 518 U.S. 343, 351 (1996).

We affirm the district court's judgment dismissing the complaint on the grounds that the complaint fails to state a claim for which relief can be granted.

—————————————

## CONCURRENCE

—————————————

CLAY, Circuit Judge, concurring. The district court concluded that Plaintiffs' allegations of emotional distress failed to confer standing in the First Amendment context and dismissed Plaintiffs' complaint for lack of subject matter jurisdiction. I concur with the majority's decision to affirm, but I would affirm the district court's dismissal of this action on standing grounds rather than on the basis of failure to state a claim. Under the majority opinion's arguments, a plaintiff would have standing to bring a claim even if the plaintiff has no legally protected interest and even if the plaintiff has no prospect of prevailing on the merits. In this case, under settled law, Plaintiffs had no prospect of success, yet the majority opinion would nevertheless encourage the filing of Plaintiffs' futile lawsuit and others like it.

## DISCUSSION

Plaintiffs Marvin Gerber and Dr. Miriam Brysk have appealed the district court's order dismissing their complaint for lack of standing under Federal Rule of Civil Procedure 12(b)(1). Plaintiffs filed this suit against a group of protesters, Henry Herskovitz, Gloria Harb, Tom Saffold, Ruby List, Chris Mark, Deir Yassin Remembered, Inc., and Jewish Witnesses for Peace and Friends (collectively, "Protester Defendants"), for demonstrating outside Plaintiffs' synagogue on a weekly basis for nearly two decades. Plaintiffs also sued the City of Ann Arbor, Michigan, and several of its officers (collectively, "City Defendants") for failing to stop the protests. Plaintiffs asserted causes of action under the First and Fourteenth Amendments; 42 U.S.C. §§ 1981, 1982, 1983, 1985(3), and 1986; the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*; and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*

### Standard of Review

We review a district court's order dismissing an action for lack of subject matter jurisdiction *de novo*. *Does 1–10 v. Haaland*, 973 F.3d 591, 596 (6th Cir. 2020). "When a party makes a facial challenge to the district court's subject-matter jurisdiction under Rule

12(b)(1)—as is the case here—we must take as true all material allegations of the complaint." *Hale v. Morgan Stanley Smith Barney LLC*, 982 F.3d 996, 997 (6th Cir. 2020). We may affirm on any grounds supported by the record, even if different than those relied upon by the district court. *Wallace v. Oakwood Healthcare, Inc.*, 954 F.3d 879, 886 (6th Cir. 2020).

## I. Standing

The district court properly concluded that Plaintiffs lacked Article III standing. If a plaintiff lacks standing, a federal court lacks subject matter jurisdiction and must dismiss. *Murray v. U.S. Dep't of Treasury*, 681 F.3d 744, 748 (6th Cir. 2012). "In reviewing a determination of standing, we consider the complaint and the materials submitted in connection with the issue of standing." *Pedreira v. Ky. Baptist Homes for Children, Inc.*, 579 F.3d 722, 729 (6th Cir. 2009).

### A. Elements of Standing

Standing "doctrine developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood . . . [, and it] limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 578 U.S. 856, 136 S. Ct. 1540, 1547 (2016). "[S]tanding is not dispensed in gross; rather plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021).

Standing is derived from Article III's case and controversy requirement. In *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), the Supreme Court set forth now "well-worn yet enduring standards" for standing. *Thomas v. TOMS King (Ohio), LLC*, 997 F.3d 629, 634 (6th Cir. 2021). Under *Lujan*, "the irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560. "First, the plaintiff must have suffered an 'injury in fact'— an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not "conjectural" or "hypothetical."'" *Id.* (citations omitted). "Second, there must be a causal connection between the injury and the conduct complained of"—this element of standing is often referred to as traceability. *Id.* "Third, it must be 'likely,' as opposed to merely

'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (citation omitted).

Plaintiffs' primary argument on appeal is that the district court improperly reviewed the merits of their claims in dismissing their case for a lack of subject matter jurisdiction. (Appellants' Br. 39–45.) As we recently reiterated in *Benalcazar v. Genoa Township*, 1 F.4th 421 (6th Cir. 2021), "[s]ubject-matter jurisdiction over a dispute is one thing; the merits of the underlying dispute are another. Rarely do the twain meet." *Id.* at 424. We recognized that relevant to review of subject matter jurisdiction "is a threshold question, one distinct from the plausibility inquiry of Civil Rule 12(b)(6): Namely, do the federal questions raised by this complaint legitimately create federal court jurisdiction because they are not so frivolous as to be a contrived effort to create such jurisdiction?" *Id.* In *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998), the Supreme Court explained that "[d]ismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise devoid of merit as not to involve a federal controversy." *Id.* at 89 (quoting *Oneida Indian Nation of N.Y. v. Cnty. of Oneida*, 414 U.S. 661, 666 (1974)).

Applying these standards, I conclude that the district court properly dismissed Plaintiffs' claims for lack of subject matter jurisdiction. I first discuss Plaintiffs' claims against Protester Defendants and then their claims against City Defendants.

**B. Protester Defendants**

I would affirm the district court's conclusion that Plaintiffs failed to allege an injury in fact required for standing, albeit on slightly different grounds.[1] The district court found that Plaintiffs' allegations that they had suffered emotional distress and that the protests interfered with Plaintiffs' enjoyment of religious services failed to allege a concrete injury. (R. 66, Page

---

[1]I reject the contention that because the Supreme Court decided an apparently similar case, *Synder v. Phelps*, 562 U.S. 443 (2011), on the merits, rather than dismissing for lack of subject matter jurisdiction, that the district court's Rule 12(b)(1) ruling in this case was inappropriate. The Supreme Court has "repeatedly held that the existence of unaddressed jurisdictional defects has no precedential effect." *Lewis v. Casey*, 518 U.S. 343, 352 n.2 (1996). Additionally, my determination that Plaintiffs' claims were foreclosed by prior decisions of the Supreme Court is informed, in large part, by the *Snyder* decision itself.

IDs ##1904–05.)  Contrary to Plaintiffs' claim on appeal, the district court properly accepted as true Plaintiffs' allegations that the protests caused Plaintiffs' emotional distress.  (Appellants' Br. 9–12; R. 66, Page IDs ##1901–02.)

The district court observed that the injury-in-fact prong of the standing inquiry "includes two sub-elements: (1) concreteness; and (2) particularization."  (Order Granting Defs.' Mots. to Dismiss, R. 66, Page ID #1901.)  Under this analysis, it properly rejected Plaintiffs' claims that Protester Defendants interfered with Plaintiffs' enjoyment of attending religious services since "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."  *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 418 (2013) (alteration in original) (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972)); *see also ACLU v. NSA*, 493 F.3d 644, 662 (6th Cir. 2007) (opinion of Batchelder, J.) (approvingly cited by the Supreme Court in *Clapper*, 568 U.S. at 418) (rejecting standing on the basis of the plaintiffs' "subjective apprehension and a personal (self-imposed) unwillingness to" engage in First Amendment activity).  (R. 66, Page ID #1905.)

But it is well-established that the extreme emotional distress alleged by Plaintiffs can suffice to establish Article III standing.  *See Garland v. Orlans, PC*, 999 F.3d 432, 439–40 (6th Cir. 2021); *see also Huff v. TeleCheck Servs.*, 923 F.3d 458, 463 (6th Cir. 2019) (concluding that a plaintiff had failed to demonstrate standing, in part, because he did "not suggest that he wasted time or suffered emotional distress").

However, Plaintiffs' allegations of extreme emotional distress fail to establish standing in this case because there is no legally protected interest in not being offended by the speech of others.  Subsequent to entry of the district court's order, we clarified in *CHKRS, LLC v. City of Dublin*, 984 F.3d 483 (6th Cir. 2021), that there is a third element to the injury-in-fact inquiry, and that "[t]o establish the 'standing' required for jurisdiction under Article III of the Constitution, plaintiffs must allege the 'invasion of a legally protected interest.'"  *Id.* at 485 (citation omitted).  This standing requirement leads to "overlapping requirements for jurisdiction and the merits," but we explained that "[a]s long as a plaintiff has asserted a colorable legal claim (and has met standing's other elements), the plaintiff has satisfied Article III and the court may resolve the claim on its merits."  *Id.* at 485–86.  Given the clarity and consistency of First

Amendment precedent, Plaintiffs have failed to assert a colorable legal claim against Protester Defendants and lack standing to pursue causes of action against them. *See id.*

### 1. First Amendment Principles

Plaintiffs raise a number of arguments as to why Protester Defendants' speech on a matter of public concern, American-Israeli relations, in a traditional public forum, the sidewalk, is not entitled to First Amendment protection. But Plaintiffs face a difficult task, since the Supreme Court has repeatedly observed that both these factors are indicative of speech at the core of First Amendment protection. "Leafletting and commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment, and speech in public is at its most protected on public sidewalks, a prototypical example of a traditional public forum." *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 377 (1997).

In *Schenck*, the Supreme Court confirmed that a record "show[ing] physically abusive conduct, harassment of the police that hampered law enforcement, and the tendency of even peaceful conversations to devolve into aggressive and sometimes violent conduct" could "make[] a prohibition on classic speech in limited parts of a public sidewalk permissible." *Id.* However, Plaintiffs present no allegations that Protester Defendants block or otherwise obstruct Plaintiffs or other members of their congregations from attending religious services. Instead, Plaintiffs' claims are based entirely on their own reaction to "[t]he messages on the signs/placards . . . ." (Am. Compl., R. 11, Page ID #212; *see id.* at Page ID #214 ("The conduct of the protesters is having an adverse emotional effect on Jewish children and young adults who, approaching the Synagogue, see the signs/placards insulting their religion and denouncing their loyalty to Israel.").) For example, Plaintiff Gerber alleged that "[t]he Antisemitic message of several of the signs, and the virulently anti-Israeli messages of the signs/placards, offend and anger him, cause him extreme emotional distress, significantly diminish his enjoyment in attending Sabbath services, and have adversely affected his willingness to attend Sabbath services at the Synagogue in order to exercise his 1st Amendment right of freedom of religion." (*Id.* at Page ID #215.)[2]

---

[2]Plaintiffs Gerber and Brysk claimed in the amended complaint that they had taxpayer standing. (Am. Compl., R. 11, Page IDs ##215–16.) They do not raise these arguments on appeal, thereby forfeiting them. *See*

Plaintiffs point to no case where a plaintiff's claimed injury due to the content of a protest has been determined to be "legally cognizable . . . ." *Lujan*, 504 U.S. at 578. Plaintiffs seek relief from Protester Defendants because of signs "which insulted [Plaintiffs'] ethnicity, their religion and their loyalty to Israel . . . ." (Appellants' Br. 36.) Contrary to Plaintiffs' argument in their reply brief, the Supreme Court's decision in *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994), partially upholding a buffer zone outside an abortion clinic, does not demonstrate Plaintiffs are entitled to pursue relief against Protester Defendants. (Reply Br. 13–15.) In *Madsen*, "[t]he accepted purpose of the buffer zone [was] to protect access to the clinic and to facilitate the orderly flow of traffic on Dixie Way." *Id.* at 771. In fact, the Supreme Court in *Madsen* struck down a part of the buffer zone that prohibited the display of "images observable" during certain times around the clinic. The Court reasoned that "[i]f the blanket ban on 'images observable' was intended to reduce the level of anxiety and hypertension suffered by the patients inside the clinic, it would still fail. The only plausible reason a patient would be bothered by 'images observable' inside the clinic would be if the patient found the expression contained in such images disagreeable. But it is much easier for the clinic to pull its curtains than for a patient to stop up her ears, and no more is required to avoid seeing placards through the windows of the clinic. This provision of the injunction violates the First Amendment." *Id.* at 773; *see also McCullen v. Coakley*, 573 U.S. 464, 481 (2014) (recognizing that a law would not be content neutral if it were concerned with the undesired effects of speech on an audience). Contrary to Plaintiffs' contention that *Madsen* saves their claims, the Supreme Court's decision confirms the claims are not colorable, as required to demonstrate standing. *See CHKRS*, 984 F.3d at 485–86.

Plaintiffs' standing claim requires a finding that they have a legally protected interest in not being offended by Protester Defendants' speech. No such right exists, nor could it exist. "If there is a bedrock principle underlying the First Amendment, it is that the government may not

---

*Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019). Moreover, "if the challenged local government action involves neither an appropriation nor expenditure of city funds . . . the municipal taxpayer [will] lack standing, for in that case he will have suffered no 'direct dollars-and-cents injury.'" *Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 214 (6th Cir. 2011) (en banc) (quoting *Am. Atheists, Inc. v. City of Detroit Downtown Dev. Auth.*, 567 F.3d 278, 285 (6th Cir. 2009)). Plaintiffs do not allege that the City's decisions regarding the enforcement of the sign ordinance involves the appropriation or expenditure of funds.

prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (quoting *Texas v. Johnson*, 491 U.S. 397, 414 (1989)).  The Supreme Court and this Court have repeatedly held that legal claims based on disagreement with speech must give way to "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks . . . ." *N.Y. Times v. Sullivan*, 376 U.S. 254, 270 (1964).

The law does not protect Plaintiffs' claimed right not to observe Protester Defendants' anti-Israeli, anti-Zionist, and anti-Semitic signs.  In our pluralistic and diverse society, "[m]uch that we encounter offends our esthetic, if not our political and moral, sensibilities.  Nevertheless, the Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer. Rather, absent . . . narrow circumstances . . . , the burden normally falls upon the viewer to 'avoid further bombardment of (his sensibilities) simply by averting (his) eyes.'" *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 210–11 (1975) (fourth and fifth alterations in original) (quoting *Cohen v. California*, 403 U.S. 15, 21 (1971)).  As discussed, in *Madsen*, an abortion clinic was required "to pull its curtains" before protesters were required to put away their "images observable." *Madsen*, 512 U.S. at 773. So too here.

A plaintiff's interest in avoiding the consequences of disagreement is often raised, and rejected, in cases involving what has come to be known as the heckler's veto.  "A heckler's veto involves burdening speech 'simply because it might offend a hostile mob.'" *Bennett v. Metro. Gov't of Nashville & Davidson Cnty.*, 977 F.3d 530, 544 (6th Cir. 2020) (quoting *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134–35 (1992)).  While the heckler's veto is normally concerned with outbreaks of violence against the speaker—to justify either failing to protect the speaker against such violence or preventing the speaker from speaking in an effort to avoid violence in the first place—it represents a broader prohibition against allowing those who oppose the content of certain speech to force the government to censor that speech. *See Reno v. ACLU*, 521 U.S. 844, 880 (1997) (concluding that the Communications Decency Act's supposedly

limited prohibition on knowingly sending indecent materials "would confer broad powers of censorship, in the form of a 'heckler's veto,' upon any opponent of indecent speech").

We have recognized that lawsuits may be the means of effecting a heckler's veto. *See, e.g.*, *Jones v. Dirty World Ent. Records LLC*, 755 F.3d 398, 407 (6th Cir. 2014) (describing lawsuit against interactive computer service providers as "'heckler's veto' that would chill free speech"). "By and large, however, the courts have recognized that we cannot allow the right of free speech to be restricted based on the hostile reaction of those who disagree with it." *Ams. United for Separation of Church & State v. City of Grand Rapids*, 980 F.2d 1538, 1553 (6th Cir. 1992) (en banc).

We reaffirmed our commitment to a robust rejection of the heckler's veto in *Bible Believers v. Wayne County*, 805 F.3d 228 (6th Cir. 2015) (en banc).[3]  In *Bible Believers*, we found that the plaintiffs, a self-described evangelical group known as the Bible Believers, and its members were entitled to summary judgment.  They claimed, in part, that the government had violated their First Amendment right to freedom of speech by failing to protect them and eventually removing them from the Arab International Festival in Dearborn, Michigan.  In the course of advocating for their Christian beliefs at the festival, the Bible Believers "parad[ed] around with banners, signs, and tee-shirts that displayed messages associated with those beliefs. Many of the signs and messages displayed by the Bible Believers communicated overtly anti-Muslim sentiments." *Id.* at 236; *see id.* at 244 (recognizing that "disparaging the views of another to support one's own cause is protected by the First Amendment").   The First

---

[3]Plaintiffs' suggestion in their reply brief that this Court should disregard the en banc court's decision in *Bible Believers* because that decision did not cite *Beauharnais v. Illinois*, 343 U.S. 250 (1952), misunderstands the rules of precedent.  (Reply Br. 15 n.1.)  *Bible Believers* is binding since it has not been overruled by another decision of the en banc court.  *See Miller v. Caudill*, 936 F.3d 442, 447–48 (6th Cir. 2019).  Nor does an intervening Supreme Court decision require reconsideration of *Bible Believers*, since *Beauharnais* was decided over sixty years before *Bible Believers*.  *See Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 471 (6th Cir. 2016).  Substantively, in *Beauharnais*, the Supreme Court, over a vigorous dissent, upheld the defendant's conviction under an Illinois statute that prohibited publication of group libel, defined as portraying a lack of virtue of a class of citizens.  While the decision has never explicitly been overruled, it appears that the case has been limited to its precise facts in subsequent decisions of the Supreme Court.  *N.Y. Times*, 376 U.S. at 268–69; *see Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. #204*, 523 F.3d 668, 672 (7th Cir. 2008) ("Anyway, though *Beauharnais v. Illinois*, 343 U.S. 250 (1952), has never been overruled, no one thinks the First Amendment would today be interpreted to allow group defamation to be prohibited.").

Amendment conduct at issue in *Bible Believers* is very similar as this case, where Protester Defendants display signs with anti-Semitic messages.

Plaintiffs here are seeking relief in the form of an injunction removing Protester Defendants from their demonstration site. But in *Bible Believers*, that "relief" entitled the plaintiff protesters, and not the defendant county, to summary judgment, despite the fact that the protesters' speech was offensive and derogatory to those whom the speakers expected would be present. Like Protester Defendants in this case, the Bible Believers' offensive message did "not advocate, condone, or even embrace imminent violence or lawlessness." *Id.* at 244. Accordingly, "[t]his claim of injury by [Plaintiffs] is, therefore, not to a legally cognizable right." *McConnell v. FEC*, 540 U.S. 93, 227 (2003), *rev'd on other grounds*, *Citizens United v. FEC*, 558 U.S. 310 (2010).

Plaintiffs' assertion that their emotional distress overcomes Protester Defendants' right to free speech is foreclosed by the Supreme Court's decision in *Snyder*. In *Snyder*, the Supreme Court held that the First Amendment shielded members of the Westboro Baptist Church against tort liability for publicizing their anti-homosexuality message by picketing at military funerals. Specifically, the Supreme Court held it was unconstitutional to apply a state intentional infliction of emotional distress statute against the picketers.

The Supreme Court began its analysis by observing that "[w]hether the First Amendment prohibits holding Westboro liable for its speech in this case turns largely on whether that speech is of public or private concern, as determined by all the circumstances of the case." *Snyder*, 562 U.S. at 451. Plaintiffs never dispute that, as offensive as they find Protester Defendants' speech, that it is not on an issue of public concern. "The arguably 'inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.'" *Id.* at 453 (quoting *Rankin v. McPherson*, 483 U.S. 378, 387 (1987)). Like the members of the Westboro Baptist Church, Protester Defendants are displaying signs relating to issues of interest to society, not a private dispute. Moreover, as with the members of the Westboro Baptist Church, Protester Defendants' "speech was at a public place on a matter of public concern, [and therefore] that speech is entitled to 'special protection' under the First

Amendment. Such speech cannot be restricted simply because it is upsetting or arouses contempt." *Id.* at 458.

### 2. First Amendment Conduct

Plaintiffs' contrary arguments that the First Amendment context does not affect consideration of their claims or that Protester Defendants' conduct is not protected by the First Amendment are unavailing.

In their briefing, Plaintiffs emphasize a Southern District of Ohio decision in *Wells v. Rhodes*, 928 F. Supp. 2d 920 (S.D. Ohio 2013), that they argue shows that extreme emotional distress confers standing in the First Amendment context. (Appellants' Br. 21–24.) However, the Supreme Court explicitly held that the conduct in that case, cross burning with intent to intimidate, was outside the protection of the First Amendment in *Virginia v. Black*, 538 U.S. 343, 362 (2003).[4] The Supreme Court concluded that "[t]he First Amendment permits Virginia to outlaw cross burnings done with the intent to intimidate because burning a cross is a particularly virulent form of intimidation." *Id.* at 363.

Plaintiffs' other claims that Protester Defendants' conduct is not protected by the First Amendment also fail. First, Plaintiffs attempt to argue that Protester Defendants' speech can be regulated like verbal workplace harassment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, or defamation. Plaintiffs do not dispute that Protester Defendants' speech, as offensive as it may be, is on a matter of public concern, and that it is offensive because of its content. As the Supreme Court reiterated in *Snyder*, "[s]peech on matters of public concern is at the heart of the First Amendment's protection." *Synder*, 562 U.S. at 452 (cleaned up). And as the Supreme Court explained in *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992),

---

[4]Plaintiffs, in their brief, suggest that the district court's failure to cite *Wells* may have been indicative of racial bias. (Appellants' Br. 23–24.). We previously concluded that a "suggestion that bigotry underlay" the district court's decision, "a claim completely unsupported in the record before this court, was not well received [] and will not be countenanced in the future by this court. Counsel are advised that personal aspersions, whether they be cast at opposing counsel or members of the judiciary, have no place in argument before us unless they are strictly pertinent to a legal issue, such as the imposition of Rule 11 sanctions or claims of judicial or prosecutorial misconduct." *Howard v. Sec'y of Health & Hum. Servs.*, 932 F.2d 505, 509 n.2 (6th Cir. 1991).

"Title VII's general prohibition against sexual discrimination in employment practices . . . does not target conduct on the basis of its expressive content . . . ." *Id.* at 389–90.

Plaintiffs' invocation of defamation precedents also does not require a contrary result to the one reached by the district court. For example, in *United States v. Alvarez*, 567 U.S. 709 (2012), in which the Supreme Court struck down a federal law that prohibited false claims about military honors, Justice Kennedy, for a plurality, described the "legally cognizable harm associated with a false statement, such as an invasion of privacy or the costs of vexatious litigation," neither of which are applicable here. *Alvarez*, 567 U.S. at 719. In fact, the plurality confirmed that "falsity and nothing more" is an insufficient basis to prohibit speech. *Id.*; *see R.A.V.*, 505 U.S. at 383–84 (recognizing that historically regulated categories of speech like defamation are not "entirely invisible to the Constitution, so that they may be made the vehicles for content discrimination unrelated to their distinctively proscribable content").

Fundamentally, Plaintiffs' position misunderstands the First Amendment. It is not "an invasion of a legally protected interest" to be presented with offensive or disagreeable speech on matters of public concern. *Lujan*, 504 U.S. at 560. That "disagreement" cannot give rise to standing has been confirmed by the Supreme Court. For example, in *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, (1982), the Court denied standing in an Establishment Clause suit challenging the federal government's conveyance of land to a religious school. It found that the plaintiffs had "fail[ed] to identify any personal injury suffered by them *as a consequence* of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees. That is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms." *Id.* at 485–86. In fact, the Supreme Court recognized in *Terminiello v. City of Chicago*, 337 U.S. 1 (1949), that "a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Id.* at 4. Accordingly, freedom of speech is "protected against censorship or punishment, unless likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Id.; see also Nwanguma v.*

*Trump*, 903 F.3d 604, 609 (6th Cir. 2018) (explaining that "only speech that explicitly encourages the imminent use of violence or lawless action is outside the protection of the First Amendment").

> As the Supreme Court concluded in *Snyder*:
>
> Speech is powerful. It can stir people to action, move them to tears of both joy and sorrow, and—as it did here—inflict great pain. On the facts before us, we cannot react to that pain by punishing the speaker. As a Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate. That choice requires that we shield Westboro from tort liability for its picketing in this case.

*Synder*, 562 U.S. at 460–61.

Moreover, Plaintiffs' arguments that Protester Defendants' demonstrations are not protected by the First Amendment are completely unfounded. Plaintiffs point to a unique "concurrence of factors" in support of their contention, comprising of: "(1) protests in proximity to a house of worship; (2) located in a residential area; (3) where the members of that house of worship constitute a captive audience because the protesters are targeting them at their house of worship; (4) on a repeated weekly and yearly basis; [and] (5) where the congregants' children are also exposed to the signs." (Reply Br. 4–5.)

Plaintiffs have pointed to no case where "proximity to a house of worship" has reduced First Amendment protections. In fact, as referenced at oral argument, the Supreme Court's speech cases involving Jehovah's Witnesses recognized that location is a critical component to speech. Oral Argument at 09:50–11:50. For example, in *Cantwell v. Connecticut*, 310 U.S. 296 (1940), the Supreme Court overturned the convictions of Jehovah's Witnesses who were "going singly from house to house on Cassius Street . . . ." *Id.* at 301. As the Supreme Court explained, "Cassius Street is in a thickly populated neighborhood, where about ninety per cent of the residents are Roman Catholics. A phonograph record, describing a book entitled 'Enemies', included an attack on the Catholic religion." *Id.*; *see Bible Believers*, 805 F.3d at 263 (Boggs, J., concurring) ("The Jehovah's Witnesses in *Cantwell*, for example, played phonographs criticizing the Roman Catholic Church in a large Catholic neighborhood, much like the Bible Believers criticized Islam at the Arab International Festival.").

Other circuits have rejected similar claims that houses of worship are entitled to special protection under the First Amendment. For example, the Eighth Circuit held that a Missouri law that prohibited disturbing religious services could not be sustained under the First Amendment in *Survivors Network of Those Abused by Priests, Inc. v. Joyce*, 779 F.3d 785 (8th Cir. 2015). The court found that the statute's locational ban—around churches and buildings used for religious purposes—was particularly concerning because "[t]hese locations are the most likely places for [the plaintiffs] to find their intended audience . . . ." *Id.* at 792. The Eighth Circuit rejected the argument presented here that government intervention was necessary to protect the parishioners' free exercise of religion, finding "the content based prohibitions the Act places on profane or rude speech are not necessary to protect that freedom." *Id.* at 793.

Plaintiffs' other arguments that Protester Defendants' conduct is not protected by the First Amendment are similarly unavailing. In *Frisby v. Schultz*, 487 U.S. 474 (1988), the Supreme Court upheld an ordinance which prohibited picketing in front of a particular residence. In that opinion, the Supreme Court observed that "[o]ur prior holdings make clear that a public street does not lose its status as a traditional public forum simply because it runs through a residential neighborhood," squarely foreclosing Plaintiffs' second argument that the First Amendment does not protect Protester Defendants' activity because the synagogue is located in a residential area. *Id.* at 480. Plaintiffs' argument that they are a "captive audience" is also unconvincing because, as also explained by *Frisby*, the captive audience doctrine has been linked to "residential privacy," which does not apply to a house of worship. *Id.* at 484–85. *Snyder* also recognized that the captive audience doctrine had been limited to cases involving a plaintiff's residence. *Snyder*, 562 U.S. at 459–60.

Nor do Plaintiffs provide any support for their contention that the long-running nature of Protester Defendants' demonstrations affects the First Amendment analysis. This Court in *Pouillon v. City of Owosso*, 206 F.3d 711 (6th Cir. 2000), confronted a challenge to a decision by a city to prevent an anti-abortion protester from demonstrating on the city hall steps and instead requiring him to protest on the sidewalk. The plaintiff in that case had "staged abortion protests for a portion of each day almost every weekday for over ten years." *Id.* at 713. Despite the duration and frequency of the plaintiff's protests, there was no question that the First

Amendment protected his conduct, and we were required to answer "whether requiring Pouillon to move to the sidewalk was a reasonable time, place, and manner restriction that, as the First Amendment requires, left open ample alternative channels of communication." *Id.* at 717–18.

Finally, Plaintiffs' argument that the Protester Defendants are deprived of First Amendment protection because children see their anti-Israeli, anti-Zionist, and anti-Semitic signs, has also been repeatedly rejected by the Supreme Court and this Court. For example, the Supreme Court in *Reno v. ACLU* reiterated that the interest in protecting children from harmful materials "does not justify an unnecessarily broad suppression of speech addressed to adults." *Reno*, 521 U.S. at 875. Similarly, this Court in *Bible Believers* did not doubt that the plaintiffs' speech was entitled to First Amendment protections even though at one point, the crowd was "made up predominantly of adolescents . . . ." *Bible Believers*, 805 F.3d at 253 (majority opinion).

In light of the preceding analysis, and despite Plaintiffs' numerous arguments, it is clear that that they are bringing this suit to "silence a speaker with whom [they] disagree." *Id.* at 234. "The First Amendment simply does not countenance this scenario." *Id.* at 237.

"Dismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise devoid of merit as not to involve a federal controversy." *Steel Co.*, 523 U.S. at 89 (quoting *Oneida Indian Nation of N.Y.*, 414 U.S. at 666). Plaintiffs' claims that a federal court should punish or silence protesters exercising their First Amendment rights does not pass this threshold inquiry. Their claims are foreclosed by decisions of the Supreme Court, which in some cases, like *Madsen* and *Frisby*, Plaintiffs selectively cite in support of their own position. This supports the conclusion that Plaintiffs' claims are "so frivolous as to be a contrived effort to create" federal jurisdiction. *Benalcazar*, 1 F.4th at 424. In light of this conclusion, the parties' arguments on the traceability and redressability elements of standing need not be considered. *See Brintley v. Aeroquip Credit Union*, 936 F.3d 489 (6th Cir. 2019).

### C. City Defendants

Plaintiffs agree that if they lack standing against Protester Defendants on their 42 U.S.C. §§ 1982, 1983, and 1985(3) claims, that they also lack standing against City Defendants for their claims under those provisions and § 1986. (Mot. for Recons., R. 67, Page IDs ##1937–38.) In light of the prior discussion of the district court's dismissal for lack of standing on Plaintiffs' claims against Protester Defendants, I conclude that Plaintiffs lack standing against City Defendants for their claims under the civil rights statutes.

However, Plaintiffs maintain that the reasoning in the district court's dismissal order did not apply to four causes of action that they pled only against City Defendants: (1) substantive due process claim; (2) right to petition claim; (3) RFRA claim; and (4) RLUIPA claim.

As an initial matter, Plaintiffs cannot assert a colorable RFRA claim against the City of Ann Arbor, since the Supreme Court held in 1997 in *City of Boerne v. Flores*, 521 U.S. 507 (1997), that RFRA could not constitutionally be applied to states and local governments, as at issue here and as Plaintiffs recognize in their amended complaint. (Am. Compl., R. 11, Page IDs ##276–280.) Accordingly, Plaintiffs lack standing for the RFRA claim against the City of Ann Arbor and its officers.

Plaintiffs also lack standing to pursue their substantive due process and RLUIPA claims. "[A] grievance that amounts to nothing more than an abstract and generalized harm to a citizen's interest in the proper application of law does not count as an 'injury in fact,'" and cannot establish standing. *Carney v. Adams*, 141 S. Ct. 493, 498 (2020); *see Allen v. Wright*, 468 U.S. 737, 754 (1984) ("This Court has repeatedly held that an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court."). Given that we have already concluded that the emotional distress Plaintiffs feel because of Protester Defendants' conduct cannot establish standing, Plaintiffs' disagreement with the City on how to interpret Ann Arbor's sign code cannot either. *See Carney*, 141 S. Ct. at 499. "A litigant 'raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not

state an Article III case or controversy.'"  *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013) (quoting *Lujan*, 504 U.S. at 573–74).

Plaintiffs also do not have standing for their claim that the City violated their right to petition the government for redress of grievances and access to courts under the First and Fourteenth Amendments.  Plaintiffs argue that City Defendants violated these rights by requiring that Plaintiffs only seek information about the sign code from the City Attorney's office, rather than permitting them to speak with other City officials.  Plaintiffs' petition claim is based on the premise that the First Amendment guarantees right of access to courts, and that right, in turn, encompasses the right to obtain information from governmental officials.  (Am. Compl., R. 11, Page IDs ##271–72.)  "The right of access to the courts is indeed but one aspect of the right to petition."  *Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).  The right of access to courts has often been explored in the context of prisoner suits.

In *Lewis v. Casey*, 518 U.S. 343 (1996), the Supreme Court confronted a claim that prisoners were entitled to a certain level of information from the state to help them pursue their legal claims.  In that case, a particular level of law library facilities was at issue.  *Lewis* observed that "[t]he requirement that an inmate alleging a violation of [the fundamental constitutional right of access to the courts] must show actual injury derives ultimately from the doctrine of standing . . . ."  *Id.* at 349. The Court concluded that a plaintiff must allege that the government "hindered his efforts to pursue a [non-frivolous] legal claim" to demonstrate standing for his access to courts claim.  *Id.* at 351.

Plaintiffs in this case have made no showing or allegation of how their failure to speak to particular City of Ann Arbor employees prejudiced their prosecution of this suit or their access to courts more generally.  Nor have they otherwise alleged "a freestanding right" to speak to any particular government official they choose.  *Id.*; *see Putnam Pit, Inc. v. City of Cookeville*, 221 F.3d 834, 840 (6th Cir. 2000) (recognizing that while "the First Amendment protects information gathering, it does not provide blanket access to information within the government's control").  Accordingly, Plaintiffs have failed to allege an actual injury and lack standing to pursue their right to petition claim.

For the reasons explained above, Plaintiffs lack standing to pursue any of their claims against City Defendants in this suit.

While I agree with the majority's determination that the district court's dismissal of Plaintiffs' complaint should be upheld, I would do so on the basis of Plaintiffs' lack of standing rather than as a result of the complaint's failure to state a claim.

**EXHIBIT 2**

 Gmail                                                    **Marc Susselman <marcsusselman@gmail.com>**

## Fwd: Pic

**HENRY BRYSK** <bryskh@comcast.net>                                    Fri, Oct 1, 2021 at 8:08 PM
To: Marc Susselman <marcsusselman@gmail.com>

The Gerbers came over this afternoon and stampeded Miriam into reversing herself; she was quite
clueless and ignored me. I disagreed, but I had no control over the situation.

This has been a long and repeatedly disheartening process. Much more massively for you, of
course. I am increasingly convinced that fighting for the ungrateful is Quixotic.
[Quoted text hidden]

**EXHIBIT 3**

# UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

Marvin Gerber, Dr. Miriam Brysk,

      Plaintiffs/Appellants,

vs.

                                       Civil Action No. 2:19-cv-13726
                                       Sixth Circuit Case No. 20-1870

Henry Herskovitz, *et al.*

      Defendants/Appellees.

                                                                         /

## DECLARATION OF HENRY BRYSK

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1.     I am a resident of Ann Arbor, Michigan, and the husband of Dr. Miriam Brysk.

2.     On the afternoon of Friday, October 1, 2021, Marvin Gerber and his wife Florence Gerber came to our home located at 3032 Cedarbrook Rd., Ann Arbor, Michigan 48105.

3.     Mr. and Mrs. Gerber told my wife that they wanted her to sign a statement which they had prepared stating that she was terminating Marc M. Susselman as her attorney in the above captioned lawsuit.

4.     Dr. Brysk was disoriented and was suffering from extreme back pain.

5.     Mr. and Mrs. Gerber bullied Dr. Brysk into signing the statement which they had prepared indicating that she was immediately terminating Mr. Susselman as her attorney against her will.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ____8th____ day of October, 2021.

Henry Brysk